DEREK BENTSEN (Cal. Bar No. 232550)
Email: bentsend@sec.gov
EDWARD B. GERARD (Cal. Bar No. 248053)
Email: gerarde@sec.gov
MATTHEW B. REISIG (NY Bar No. 4898094)
Email: reisigm@sec.gov
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-6426 (Bentsen)
Facsimile: (202) 772-9282 (Bentsen)

LOCAL COUNSEL
DONALD SEARLES (Cal Bar. No. 135705)
Email: searlesd@sec.gov
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-4573
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, <br><br> **PLAINTIFF,** <br><br> v. <br><br> **TAYLOR WOODS** and **HOWARD WU**, <br><br> **DEFENDANTS.** | Case No.: 2:24-cv-6633 <br><br> **COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, Securities and Exchange Commission (the "Commission") alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action by authority of Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and Section 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

2.      Venue for this action is proper in the Central District of California under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Central District of California, and were effected, directly or indirectly, by making use of means or instrumentalities in interstate commerce, or the mails. For example, Defendants, who were both residents of this District at all relevant times, committed many of the acts detailed below within this District, where their Urban Commons entity was also headquartered; and several of Defendants' investor victims reside within this District.

**SUMMARY OF ALLEGATIONS**

3.      This case concerns two securities fraud schemes perpetrated by Defendants Taylor Woods and Howard Wu, involving investments in U.S.-based hotels, which resulted in investors losing over $70 million.

4.      In the first scheme, Defendants fraudulently induced investors to consent to the sale of their investment interests—collectively worth approximately $169 million—in thirteen U.S.-based hotels, by falsely representing that, among other things: (i) Defendants had secured an unaffiliated third-party buyer for all the hotels; (ii) the investors' consents, which Defendants solicited through consent solicitation statements ("consent solicitations") provided by Defendants, would be used to facilitate the sale of all the hotels to that purported buyer; (iii) the investors would receive a pro rata share of the net proceeds from sale of the hotels to the buyer; and (iv) the investors would retain a security interest in the hotels if the purported third-party buyer failed to make payments due from the sale. In the consent solicitations, the Defendants expressly

acknowledged that the investors were agreeing to a sale rather than other strategic
alternatives, which included placing the hotels into an overseas Real Estate Investment
Trust ("REIT") for public listing. In fact, as Defendants well knew, there was no third-
party buyer. Instead, the Defendants at all relevant times owned and controlled the
supposed third-party buyer. Defendants then intentionally exploited executed consent
solicitations to consolidate as many of the thirteen hotels as possible for placement into a
REIT for public listing in Singapore and assigned themselves a total of 15.2% of that
REIT's shares. While the REIT offering was pending, Woods and Wu compounded their
misrepresentations by falsely attributing delays of payments promised to investors to,
among other things, the (non-existent) third-party buyer's purported insistence on
delaying payment until after the sales of all thirteen hotels had closed.

5.    In the second scheme, which Defendants perpetrated after the REIT had
filed for bankruptcy, Defendants fraudulently raised at least $1.775 million from a new
set of investors, this time for the purported purpose of placing a bid to buy the hotels that
had comprised the REIT out of bankruptcy and operate them. Despite having
represented to investors that, among other things, their funds would be used solely for
the hotels' purchase price, would be placed in escrow, and would be returned to
investors if the bid was unsuccessful, Defendants—before even placing the bid—
misappropriated all the investors' funds, applying the bulk of the funds to personal and
unrelated business purposes. Ultimately, Defendants failed to return at least $1.75
million owed to investors.

6.    By reason of the conduct described above, the defendants violated, and
unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange
Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and
Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]. The Commission also seeks
permanent injunctions enjoining the defendants from directly or indirectly participating
in the issuance, purchase, offer or sale of any security. The Commission also seeks an

order barring Defendants from acting as officers or directors of any issuer the securities of which are registered or which is required to file reports with the Commission, an order for Defendants to disgorge their ill-gotten gains plus prejudgment interest, and an order imposing civil penalties on Defendants.

## DEFENDANTS

7.    **Taylor Woods**, age 52, currently resides in Boise, Idaho. Until 2021, he resided in this District, specifically in Orange County, California. Woods was (along with Wu) the co-founder and co-owner of Urban Commons LLC, U.S. Hospitality Investments LLC, and Sky Holdings LLC (each described below), and was likewise (along with Wu) the co-managing member of Urban Commons.

8.    **Howard Wu**, age 41, is a resident of Los Angeles, California. Wu was (along with Woods) the co-founder and co-owner of Urban Commons LLC, U.S. Hospitality Investments LLC, and Sky Holdings LLC (each described below), and was likewise (along with Woods) the sole co-managing member of Urban Commons.

## OTHER RELEVANT ENTITIES

9.    **Urban Commons LLC** ("**Urban Commons**") was a Delaware limited liability company headquartered in Los Angeles, California. Woods and Wu founded the company in 2008 and were its sole owners at all relevant times. The company offered equity interests to purchase hotels in the U.S. and managed the hotels after the purchases. The business registrations for Urban Commons are no longer in existence and good standing under the laws of the State of Delaware and the company is defunct.

10.    **Eagle Hospitality Real Estate Investment Trust** (the "**Singapore REIT**") was a REIT comprising twelve hotels managed by Urban Commons and six hotels purchased from an unrelated company ("Seller A"). Urban Commons, as the Singapore REIT's sponsor, listed the Singapore REIT on the Singapore Exchange ("SGX") on May 24, 2019. On March 23, 2020, trading in the Singapore REIT was voluntarily suspended, and it entered Chapter 11 bankruptcy on January 18, 2021. The hotels that comprised the

Singapore REIT were sold, as part of the bankruptcy, to parties not affiliated with Woods, Wu, Urban Commons, or Sky Holdings (described below).

11.    **U.S. Hospitality Investments LLC** ("**U.S. Hospitality**") was a Delaware limited liability company headquartered in Los Angeles, California. Woods and Wu founded U.S. Hospitality in November 2017 and were, at all relevant times, its sole owners. Woods and Wu used U.S. Hospitality to purchase the investors' equity interests in the thirteen hotels managed by Urban Commons, and to transfer as many of them as possible (which turned out to be twelve of them) to the Singapore REIT (described above) for public listing in Singapore. The business registrations for U.S. Hospitality are no longer in existence and good standing under the laws of the State of Delaware and the company is defunct.

12.    **Sky Holdings, LLC** ("**Sky Holdings**") was a Delaware limited liability company headquartered in Los Angeles, California. Woods and Wu formed Sky Holdings in July 2020 and were its sole owners. Woods and Wu used Sky Holdings to raise capital from investors to make a bid to purchase the hotels placed into the Singapore REIT out of bankruptcy. Sky Holdings' business registrations have been revoked and it is defunct.

**FACTS**

**I.    BACKGROUND**

13.    Defendants co-founded Urban Commons and were its sole owners and managing members at all relevant times. Urban Commons offered investors equity interests in single-purpose limited liability companies that would use the invested capital to purchase hotels in the United States. Urban Commons also managed the hotels after the purchases on behalf of the limited liability companies and received management fees for doing so.

14.    From at least 2011 through 2016, Urban Commons offered subscription agreements to investors to acquire equity interests in the single-purpose limited liability

- 5 -

companies that each purchased a U.S. hotel. The funds raised through these investment offerings were used to acquire thirteen different hotel properties in the United States, specifically: the Sheraton Pasadena, Holiday Inn Hotel & Suites Anaheim, Embassy Suites by Hilton Anaheim North, Holiday Inn Hotel & Suites San Mateo, Four Points by Sheraton San Jose Airport, the Westin Sacramento, Embassy Suites by Hilton Palm Beach, the Queen Mary Long Beach, Renaissance Denver Stapleton, the Holiday Inn Denver East, Holiday Inn Resort Orlando Suites Waterpark, the Crowne Plaza Danbury, and the Ramada Hialeah Miami Airport (hereinafter "the Thirteen Hotels").

## II.    THE SINGAPORE REIT SCHEME

**A.    Defendants Explore Strategic Alternatives for the Thirteen Hotels; Recommend Against a REIT, and in Favor of a Third-Party Sale**

15.    In or around November 2016, the Defendants caused Urban Commons to retain an investment bank ("Investment Bank A") to explore consolidating the Thirteen Hotels into a single entity to obtain senior secured financing or conduct an institutional capital raise.

16.    By May 2017, an executive with Investment Bank A (who would later serve as Urban Commons' president and as the Singapore REIT's chief executive) introduced Defendants to investment banks in Singapore, including the bank that would later become the Singapore REIT's lead underwriter ("Singapore Bank A"), to discuss the potential public listing of the Thirteen Hotels through a REIT in a foreign market.

17.    In a June 2017 email, Defendants, as managing members of Urban Commons, presented three strategic alternatives to investors in the Thirteen Hotels: (i) hold on to the properties long-term; (ii) go public by forming a REIT; or (iii) sell the hotels to a third-party buyer willing to pay a premium for them. In their presentation, Defendants acknowledged that they had consulted investment banks about going public through a foreign-market REIT, but recommended against this option, stating:

> [T]here are a number of additional execution risks, including the unique nature of US based assets being held in a foreign market REIT,

perhaps the first of its kind, so the risk of reliance on these valuations is unclear. Further, there are large up-front costs associated with the REIT formation process and a considerable amount of work required to prepare for that event as well as a number of tax considerations between the US and foreign market to consider, let alone foreign exchange rate, global influence, market fluctuations, timing to market, trading volume limitations, and currency risks to consider.

18.    In this same June 2017 email, Defendants falsely told investors that Defendants had found an unaffiliated third-party buyer who was offering a premium price for all Thirteen Hotels. Finally, in that same email, Defendants recommended that investors pursue the sale of all Thirteen Hotels rather than refinancing the Thirteen Hotels or placing them in a public REIT.

**B.    Defendants Pursue a Course At Odds With What They Recommended to the Thirteen Hotels' Investors**

19.    In November 2017, after recommending the sale of the Thirteen Hotels, Defendants established U.S. Hospitality as a Delaware limited liability corporation, in which each Defendant held a 50% common equity interest.

20.    In or around February 2018, prior to the circulation of the consent solicitations, the Defendants retained a major accounting firm ("Accounting Firm A") to conduct audits of the Thirteen Hotels ahead of listing on the SGX. Employees of Urban Commons, at the direction and with the knowledge of the Defendants, told Accounting Firm A that Urban Commons was consolidating the Thirteen Hotels into U.S. Hospitality for an initial public offering ("IPO") of a REIT on SGX targeted for September 2018. These Urban Commons employees further told Accounting Firm A, also at the direction and with the knowledge of the Defendants, that their initial plan was to use the capital raised in the IPO to buy out investors of their equity interests in the Thirteen Hotels.

21.    Defendants intentionally hid from investors Defendants' plan to use investors' consents to place the Thirteen Hotels (or as many of them as possible) into the

Singapore REIT. Further, Defendants affirmatively misled the investors by representing that instead of a REIT, Defendants were pursuing an outright sale of the Thirteen Hotels to a third-party buyer. Similarly, Defendants intentionally hid from investors that they intended to rely on the proceeds of the (undisclosed and disavowed) REIT to fund payment to investors for their equity interests in the Thirteen Hotels. Instead, Defendants falsely told investors that Defendants would use the proceeds of the outright sale of the Thirteen Hotels to the (nonexistent) third-party buyer to payout investors. At no time prior to the public listing of the Singapore REIT did the Defendants correct these misstatements and omissions to investors.

22.    During this same time, Defendants also continued to pursue what would become the Singapore REIT with Singapore Bank A and Accounting Firm A. To that end, as Defendants knew, Singapore Bank A and Accounting Firm A were both conducting due diligence on the Thirteen Hotels and doing so solely to facilitate the Singapore REIT listing on SGX. Defendants did not just fail to tell investors of that activity. Defendants affirmatively misled the investors by misrepresenting to them that the activity then taking place consisted of the third-party buyer's conducting due diligence on the Thirteen Hotels, and Defendants' negotiating with, and countering offers made by, that buyer, as to each of the Thirteen Hotels. At no time prior to the Singapore REIT did the Defendants correct these fraudulent and misleading statements to investors.

23.    Contrary to Defendants' false and misleading representations, and as Defendants knew, there were no negotiations at all with any such third-party buyer. U.S. Hospitality was not a third party, as it was owned and controlled, at all times, solely by the Defendants. Defendants, along with employees in the Finance Department at Urban Commons, had set the prices and terms of the sales of each of the Thirteen Hotels to U.S. Hospitality. The Defendants knew or were reckless in not knowing that they effectively solely controlled U.S. Hospitality, as they had signed the operating

agreement and other documents for U.S. Hospitality, including opening bank accounts as its sole owners.  Thus, as Defendants knew, any "negotiations" were effectively merely between Defendants and themselves.

24.    Defendants' misrepresentations and omissions regarding the true nature of the transaction were material to investors because their actions were directly at odds with what they recommended to investors and they failed to fully disclose how Defendants were self-interested in the transaction. Reasonable investors would have considered it material to their decision to sell their investments that the Defendants were using the consent solicitations to facilitate the Singapore REIT, the very type of overseas REIT the Defendants had cautioned investors against.

25.    Reasonable investors would also have considered it material to their decision to sell their investments that the Defendants, not a third-party buyer, were on the other side of the proposed transaction and acquiring control of their investments.

**C.     Defendants Use Materially Misleading Consent Solicitations to Fraudulently Induce Securities Sales by the Thirteen Hotels' Investors**

26.    The consent solicitations that Defendants signed and began circulating to each of the investors in the Thirteen Hotels in April 2018 disclosed, for the first time, that the name of the purported third-party buyer was U.S. Hospitality. These consent solicitations stated that Urban Commons would retain the common membership interests in the buyer, U.S. Hospitality, but that those interests would be subordinate to the preferred membership interests in U.S. Hospitality. As Defendants knew or recklessly disregarded, however, these statements were materially misleading half-truths. Defendants knew that they were effectively the *only* owners of U.S. Hospitality as there were no to very little preferred membership interests. Further, as Defendants also knew or recklessly disregarded, the operating agreement of U.S. Hospitality – which was neither included in the solicitations nor provided to investors – vested all control over U.S. Hospitality in Defendants' hands.

27.     The consent solicitations acknowledged that the Defendants had communicated three alternatives to the investors: (1) refinance the hotels to continue holding them long-term, (2) sell the hotels, or (3) "combine the entities into a real estate investment trust and engaging in a public listing, taking into account there are significant execution and valuation risks in an initial public offering due to market conditions for real estate investment trust." The consent solicitations further stated that: (1) the Defendants had recommended outright the sale to a third party to the investors, (2) in response to Defendants' recommendation, the investors had expressed "a strong preference for the sale option," and (3) the Defendants believed the sale to be both in the best interest of the investors and at fair prices.

28.     The Defendants assisted in the drafting of the consent solicitations and had ultimate authority over their approval for dissemination to investors. Although counsel assisted the Defendants in drafting the consent solicitations, counsel was not aware of Defendants' direct communications to investors which created the false impression that there was an actual third-party purchaser of the Thirteen Hotels.

29.     Specifically, in their communications with investors after the consent solicitations were sent, (i) the Defendants consistently and inaccurately referred to U.S. Hospitality as a third-party buyer; and (ii) Urban Commons employees, at Defendants' instruction, consistently and inaccurately referred to U.S. Hospitality as "they" or "them" rather than "we" or "us." By means of these communications, Defendants knowingly or recklessly created the false appearance, misleading investors, that U.S. Hospitality was under the control of persons or entities other than the Defendants.

30.     The consent solicitations also represented that the investors would receive, on a pro rata basis and according to a specified schedule, their respective shares of the Thirteen Hotels' net sales proceeds. As Defendants well knew or recklessly disregarded, however, the Thirteen Hotels (or as many of them as possible, which turned out to comprise twelve of the hotels) were going to be publicly listed in the Singapore REIT,

not sold to a third-party buyer; therefore, any payment to the investors would be entirely reliant on the success of the Singapore REIT.

31.    The consent solicitations further represented that the investors would retain a security interest in the Thirteen Hotels, which Urban Commons would continue to manage, if the purported third-party buyer failed to make payments in accordance the payment schedules set forth in the consent solicitations. As Defendants knew or recklessly disregarded, however, these representations were false and materially misleading, as they omitted the key fact that there was to be a public listing of a REIT, not a third-party sale; and that the public listing of the REIT would remove the investors' security interest, since the Thirteen Hotels would, through the REIT offering, no longer be owned by U.S. Hospitality.

32.    The consent solicitations also failed to disclose that U.S. Hospitality's governing documents – its operating agreements – *required* it to do everything it could to facilitate the undisclosed REIT. Specifically, all versions of U.S. Hospitality's operating agreements dated December 20, 2017 or later required it "do all acts and things reasonably by requested by the Manager [i.e. Urban Commons, and hence the Defendants Woods and Wu] and to cast all votes . . . to facilitate an Initial Public Offering." Further, U.S. Hospitality also agreed in a covenant to a promissory note dated January 12, 2018, to not "sell, lease, or otherwise dispose" of the Thirteen Hotels "except for the actions necessary to prepare for an underwritten initial public offering." The Defendants, acting knowingly or recklessly, did not, in the consent solicitations or otherwise, disclose these facts to investors.

33.    These misrepresentations and omissions in the consent solicitations were material to investors because they concealed the fact that the Defendants were using the consent solicitations to execute the Singapore REIT, the very type of overseas REIT the Defendants had cautioned investors against.  Further, the fact that investors' repayment was contingent on an overseas REIT rather than an outright sale and that investors would

not actually retain a security interest was material to investors as it put their potential return and interests in the hotels at significantly greater risk. A reasonable investor would consider it material to their decision to sell their investments that the Defendants were using the consent solicitations to facilitate the very type of overseas REIT the Defendants had cautioned investors against. Further, a reasonable investor would consider it material to their decision to sell their investments that that their potential investment return was contingent on the success of an overseas REIT rather than a sale, and that the overseas REIT would extinguish any supposed security interest in the Thirteen Hotels.

34.    U.S. Hospitality completed its purchase of the investors' investment interests in the Thirteen Hotels on December 27, 2018.

**D.    The Defendants Lulled Investors for a Year, Continuing to Misrepresent the True Nature of the Transaction**

35.    The consent solicitations for each of the Thirteen Hotels included a payment schedule according to which investors were to receive the proceeds from the sale of the hotels over the course of three separate payments. While it varied with each hotel, the payment schedule: typically provided for the first payment to be made four months from closing, the second, on average, seven months after closing, and a final payment to be made on January 31, 2019.

36.    By October 2018, all the required payments set forth in the payment schedules in the consent solicitations remained outstanding. The Defendants directed employees of Urban Commons to tell investors that the buyer had chosen to not make all the required payments until it had closed on all the properties, but that it would be paying the five-percent interest penalty under the purchase agreements. In fact, however, Defendants knew, or recklessly disregarded the fact, that the lack of payment stemmed from delays in the public listing of the Singapore REIT, as Singapore Bank A, the lead underwriter, continued to conduct due diligence on the Thirteen Hotels.

37.    The Defendants continued to conceal the true nature of the transaction from investors, who were still unaware that payment for their equity interests was dependent on the success of the Singapore REIT.

38.    By late January 2019, payments from the purported buyer continued to remain outstanding. The Defendants directed employees of Urban Commons to tell investors that the sales of all the properties had finally closed and gave assurances that payments would be forthcoming. To stave off any demands by investors to seek a default against U.S. Hospitality, the Defendants highlighted how the outstanding balance due to investors, under the consent solicitations, would accrue interest of 15 percent starting on February 1, 2019, and that the buyer actually would have until July 31, 2019 to avoid default.

39.    The Defendants continued, knowingly or recklessly, to conceal that payment for the equity interests was reliant on the success of the Singapore REIT, and did not disclose, that (i) payment of the five percent interest that had been accruing since October 2018, as well as (ii) payment of the additional 15 percent interest accruing since February 2019, would also be contingent on the success of the Singapore REIT. Defendants' materially misleading promises of interest payments, combined with their materially misleading omission that any such payments depended on the success of the undisclosed Singapore REIT, had the effect of lulling investors, thereby giving Defendants more time to finalize the public listing of the Singapore REIT.

40.    On or about April 3, 2019, the Defendants directed employees of Urban Commons to tell investors that the buyer had "indicated that they are in the final stages of their process and are moving their capital and planning on paying us off in the next 2-3 weeks." Defendants knew, or recklessly disregarded the truth, that this statement was materially false and misleading, since there was no such buyer, and what was nearing its "final stages" was only the launch of the undisclosed REIT, not any third-party sale. Again, by this statement, the Defendants continued to mislead investors into believing

that payment was imminent and would be made in full, and continued to conceal the fact that receipt of these payments depended on the success of the Singapore REIT.

41.    In the weeks prior to the public listing of the Singapore REIT in May 2019, Defendants learned that the underwriters were recommending a lower offering price as the prospective public listing was undersubscribed. The lower offering price would, as Defendants knew or recklessly disregarded, reduce the proceeds from the offering – proceeds that Defendants knew, or recklessly disregarded, were, in truth, essential both to paying off existing debt on the properties in the Singapore REIT and to making the payments Defendants had promised to investors.

42.    Because Defendants realized the public listing of the Singapore REIT would not provide sufficient cash, and to buy more time to pay investors, the Defendants approached several investors in the days prior to the public listing of the Singapore REIT seeking extensions of payments due on behalf of U.S. Hospitality. The Defendants misrepresented to these investors that U.S. Hospitality was in a position to pay 70-80 percent of the payment obligations, and that the remaining payments would be forthcoming shortly if the entity could acquire a few additional months to make the remaining payments, as the buyer was pursuing a public listing of a REIT in Singapore. These extension agreements promised the investors an absolute 14 percent return regardless of whether the payments came earlier than six months.

43.    Contrary to the Defendants' claims, U.S. Hospitality was not in a position to make substantial payments to existing investors, and it was the Defendants who were the sponsors and founders of the REIT, not a third-party buyer. The Defendants also omitted from investors that payment under the extensions would remain reliant on the success of the impending public listing of the Singapore REIT, which the Defendants knew or were reckless in not knowing would not provide the necessary amounts of capital funding to pay these investors. Further, the Defendants knowingly or recklessly failed to disclose to investors their role as sponsors and founders of the REIT and that

payment under the extensions would be reliant on the future market value of the Singapore REIT shares, with such payments being possible only to the extent the Singapore REIT's shares could be sold by the Defendants or others at high enough prices to fund them.

44.    On or about May 24, 2019, the Singapore REIT, which contained the Thirteen Hotels that the investors had sold to U.S. Hospitality, except the Ramada Hialeah Miami Airport, commenced its initial public offering on SGX. The Defendants stood to benefit from the public listing of the Singapore REIT, had it been successful, as they each received 66,101,999 shares for a combined 15.2 percent interest in the Singapore REIT. These shares were represented in the Singapore REIT's prospectus as explicitly serving as purchase consideration for the U.S. Hospitality portfolio. The Defendants knew, and implicitly acknowledged with their receipt of these shares, that they were, at all times, the controlling owners of U.S. Hospitality. At a listing price of $0.78, these shares represented nearly $51.6 million of value to each Defendant.

**E.    After the Singapore REIT's IPO, the Defendants Engaged in a Scheme to Further Lull Investors and Conceal Their Fraud**

45.    The public listing of the Singapore REIT did not return sufficient cash to pay the outstanding payments owed to investors who had sold their equity interests to U.S. Hospitality. Full payment under the purchase and sale agreements with U.S. Hospitality was due on January 31, 2019. The default date under these agreements was July 31, 2019.

46.    As the founders of the Singapore REIT, the Defendants and their collective 15.2 percent equity interest in the offering were subject to a six-month lock-up of all the shares and then a further six-month lock-up of half of the shares. As a result, the Defendants could not use proceeds from the sale of their shares to pay investors, if they chose, until six or twelve months after the public listing. Faced with an inability to pay investors in the Thirteen Hotels as promised, Defendants caused U.S. Hospitality to

enter into an assignment and assumption agreement with Seller A (a company described in ¶ 10 above), which provided that Seller A would assume the debts U.S. Hospitality owed the investors in the Thirteen Hotels. As consideration, Seller A received shares in the Singapore REIT in the same amount as the debt owed to investors. Defendants knowingly or recklessly failed to disclose this assignment and assumption agreement to investors at the time.

47.    Seller A had an existing business relationship with the Defendants. Seller A previously sold 6 other hotels to entities solely controlled by the Defendants to consolidate them with the twelve hotels of U.S. Hospitality for placement into the Singapore REIT. In lieu of cash from Defendants for the six hotels, Seller A received approximately $252 million worth of shares in the Singapore REIT.

48.    The prospectus of the Singapore REIT represented that Seller A and the Defendants were unrelated and did not disclose many of the agreements between them, and hence, the full scope of their close relationship was not known to foreign regulators, the underwriters including Singapore Bank A, investors in the Thirteen Hotels (to whom the Defendants did not, in any event, furnish the prospectus), and foreign investors in the public listing.

49.    On August 1, 2019, the Defendants, on behalf of U.S. Hospitality, drafted, signed, and sent a default notice from U.S. Hospitality, which they continued to solely own, to Seller A.  At or about the same time, in a separate communication, the Defendants told Seller A to ignore the default notice.  Thereafter, the Defendants continued to be aware both that Seller A was selling its shares and how much, if any, of the resulting sale proceeds, were being transferred to U.S. Hospitality to pay investors who had sold the Thirteen Hotels to it.

50.    On March 24, 2020, trading in the Singapore REIT was voluntarily halted on SGX.

51.     On or about March 30, 2020, in a letter to investors, the Defendants disclosed for the first time U.S. Hospitality's agreements with Seller A, including the assignment and assumption and the default notice. The Defendants did not, however, disclose to investors that Defendants had, on or about the same date as the default notice, separately instructed Seller A to ignore the default notice. The Defendants told the investors that Seller A was the buyer. The Defendants knew or were reckless in not knowing this representation was materially false and misleading. As founders and directors of the Singapore REIT, the Defendants knew or recklessly disregarded that its prospectus – which was not publicly disclosed in the United States – clearly stated that it had been the Defendants who had acquired the U.S. Hospitality properties in addition to purchasing the 6 hotels from Seller A. Through these misrepresentations, the Defendants continued, knowingly or recklessly, to conceal their fraudulent scheme and lull investors.

52.     In this same letter, the Defendants also misrepresented the reason why the investors no longer had any pledged security interests in the Thirteen Hotels, stating that the Defendants had converted these interests into equity pledges in the Singapore REIT, believing this action to have been in the best interests of the investors.  In reality, however, as the Defendants knew, or recklessly disregarded the truth of the fact that, they had converted the pledged security interests because hotels encumbered by such pledges could not be included in a publicly listed REIT. Since the equity pledges were now tied to publicly traded shares in the Singapore REIT that had been halted from trading, the Defendants started in this letter falsely and misleadingly to blame the global COVID-19 pandemic as the cause of the investor losses.  By so doing, Defendants knowingly or recklessly further lulled and concealed from investors Defendants' responsibility for the fraud in which Defendants had engaged to the detriment of their investors.

53.     On May 26, 2020, the Singapore REIT received an inquiry from SGX concerning material interested person transactions that were not disclosed in the Singapore REIT offering, which led the Defendants to resign as directors of the Singapore REIT. By January 18, 2021, the hotels that formed the REIT filed Chapter 11 bankruptcy.

## III.    THE SKY HOLDINGS SCHEME

54.     Prior to entering bankruptcy, the hotels comprising the Singapore REIT began to experience declines in cash flow, resulting in a series of defaults, culminating in the acceleration of the Singapore REIT's primary loan. As noted above, on March 24, 2020, trading of the Singapore REIT was halted. As a result of this financial distress, from April to December 2020, the Singapore REIT underwent a process to sell or restructure its hotel assets.

55.     In or around June 2020, Defendants formed Sky Holdings for the purpose of restructuring and acquiring the distressed Singapore REIT's assets. After the Singapore REIT restructuring failed and it filed for bankruptcy, Defendants then shifted their focus to organizing a bid to acquire the hotels out of bankruptcy.

56.     Between around January and May 2021, Defendants, through Sky Holdings, raised at least $1.775 million from U.S. investors purportedly to fund the purchase of the hotels out of bankruptcy. In exchange for their investment, Defendants offered investors equity interests in Sky Holdings.

57.     In written investor materials and oral statements, Defendants knowingly or recklessly misrepresented to potential and actual investors that (1) Defendants had secured $350 million in debt financing commitments and needed the remaining funds it was soliciting from investors to complete the purchase of the hotels in bankruptcy; (2) the proceeds of the securities offering would be used solely for the purchase price for the hotels (with Defendants paying for any legal

and administrative expenses related to the bid); and (3) the offering's proceeds would be held in escrow and would be returned if the bid was unsuccessful.  All these statements were false. To encourage investors to act quickly, Defendants further misrepresented that there were limited investor slots and the funds being solicited were needed immediately because of the purported impending deadline for submitting the bid and completing the transaction.

58.    During the period of the Sky Holdings securities offering, Defendants were facing significant financial issues (with little to no cash flow), both personally and across their businesses, and were in desperate need for capital. The funds received from Sky Holdings investors comprised the bulk of Sky Holdings' deposits for the period from January to May 2021. Rather than use these proceeds as they represented to investors, Defendants, who were the sole signatories on Sky Holdings' account, and controlled the disbursement of all Sky Holdings funds, knowingly and/or recklessly  misappropriated all of the funds raised through the offering, paying nearly $1 million to either themselves or to shore up their outside businesses, and using the remainder for legal and administrative expenses they had told investors they, rather than investors, would pay.

59.    Throughout 2021, Defendants attempted to secure debt financing for their bid, but were unsuccessful. Defendants never received financing commitments from any source. Due to lack of capital and other reasons, including their involvement in the failed Singapore REIT, Defendants' financial adviser and counsel repeatedly advised Defendants that their chance of winning the bid was remote. Throughout the bankruptcy process, Defendants were aware of the bid procedures and bid deadline of May 14, 2021.

60.    Whether or not Defendants had secured debt financing was material to investors' decision to invest as it would determine, in large part, the likelihood Defendant would have the ability to actually purchase the hotel assets out of

bankruptcy. Reasonable investors would have considered it material to their

decision to invest in Sky Holdings that the Defendants had not secured any debt

financing for their bid – let alone $350 million as the Defendants had represented.

61.    On or about May 14, 2021, Defendants, through a separate entity

Constellation Hospitality Group, submitted a bid to purchase the hotels, which

included a deposit of $10 million of funds into escrow. By the time of the bid,

Defendants had already spent the Sky Holdings investment offering proceeds and

were forced to borrow the funds needed for the deposit. The next day, counsel for

the Singapore REIT in bankruptcy notified Defendants that their bid was

insufficient because they failed to comply with the bid procedures, including, but

not limited to, failing to provide proof of financing commitments and submitting a

wholly inadequate deposit. On or about June 10, 2021, the deposit funds were

returned to Defendants' borrower.

62.    Following Defendants' unsuccessful bid, Sky Holdings investors

demanded the return of their funds in accordance with the terms of the investor

agreements and Defendants' promises. In response, Defendants knowingly and or

recklessly lulled investors with continued false representations in oral statements

and text messages that they were unable to return their funds because they were

tied up in escrow with the bankruptcy court. Despite having assured investors in

their Sky Holdings offering that the investors' funds would be held in escrow and

would be returned if the bid was unsuccessful, Defendants failed to return investor

funds in the amount of at least $1.75 million following the rejection of their bid.

63.    It was material to investors that their investment would be used solely for

purchase bid of the hotel assets and that their funds would be held in escrow rather than

misappropriated for Defendants' personal expenses because otherwise their investment

would be put at considerable risk. Reasonable investors would have considered it

material to their decision to invest in Sky Holdings that despite their agreements and

statements to the contrary, the Defendants would use Sky Holdings investors' funds for their outside businesses and to pay legal and administrative expenses instead of holding those funds in escrow for the bid, and that by so doing, the Defendants would not be able to return the investors' funds as promised if the bid was unsuccessful.

## IV.    TOLLING AGREEMENTS

64.    Between July 2023 and March 2024, Defendants each entered into three separate tolling agreements with the SEC. Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendants] authorized, instituted or brought by … the Commission … arising out of the [Commission's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended…." Each tolling agreement further provides that the Defendants "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense." Collectively, these agreements tolled the running of any limitations period or any other time-related defenses available to each of the Defendants for a period of approximately twelve months and 18 days, thereby preserving the timeliness of the Commission's claims for civil penalties as to all conduct in or after July 2018.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of the Securities Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] (BOTH DEFENDANTS)

65.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 64 above.

66.    Defendants Woods and Wu, by engaging in the conduct described

above, each, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

67.    By reason of the foregoing, Defendants each violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CAUSE OF ACTION

**Violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)]
(BOTH DEFENDANTS)**

68.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 2, 5 through 12, and 54 through 64, above.

69.    By engaging in the conduct described above, Defendants each, in the offer or sale of securities, and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts of by omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the buyer.

70.    By reason of the foregoing, Defendants each, directly or indirectly

violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants Woods and Wu committed the violations of the Federal Securities Laws as alleged in this Complaint.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Woods and Wu and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from:

a.  violating the federal securities laws alleged in this complaint:

　1.  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

　2.  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

b.  directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account in his own name.

### III.

Ordering Defendants to disgorge all ill-gotten gains obtained as a result of the acts or courses of conduct alleged in this Complaint, together with prejudgment interest

thereon, pursuant to Section 21(d)(3), (d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)].

**IV.**

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Permanently barring Defendants from serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2).

**VI.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Granting such other and further relief as this Court may determine to be just and necessary.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, the Commission demands trial by jury.

Dated: August 6, 2024                    /s/ Derek Bentsen
                                         Donald Searles
                                         Derek Bentsen
                                         Edward B. Gerard
                                         Matthew B. Reisig
                                         Attorneys for Plaintiff
                                         Securities and Exchange Commission